# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**Debra Gassman,**

    Plaintiff,                        **Case No. 24-cv-01279**

    v.                                 Honorable Joan H. Lefkow

**COOK COUNTY and SHARONE R.
MITCHELL, JR., solely in his Official Capacity as
PUBLIC DEFENDER OF COOK COUNTY,**

    Defendants.

## BRIEF OF AMICUS CURIAE, THE NATIONAL LAWYERS GUILD CHICAGO

The Chicago Chapter of the National Lawyers' Guild, through undersigned counsel, respectfully offers the following amicus brief in support of Defendants' Motion to Dismiss Plaintiff's Complaint:

I.     Defendants appropriately limited the display of an unprofessional and violent symbol in a public office.

The determination of whether speech is constitutionally protected is a question of law for the Court. *Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 940 (7th Cir. 2004). Speech is protected when the employee speaks "as a citizen upon matters of public concern" and her interest in making that speech outweighs the interests of the employer in restricting it. *Connick v. Myers*, 461 U.S. 138, 147 (1983); *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968).

    A.  The Public Defender can lawfully make reasonable neutral rules regulating speech in nonpublic fora.

    1.  The Public Defender mailbox and Plaintiff's office are quintessential nonpublic fora.

A public forum is created when the government "intentionally open[s] a nontraditional forum for public discourse." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992). In

1

contrast, when government-controlled property is set aside as separate from "acknowledged public areas" for a particular government purpose, it is considered a nonpublic forum, or "a special enclave, subject to greater restriction." *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 680 (1992). A school's internal mail system, for example, is not a public forum. *Perry Educ. Ass'n v. Perry Educators' Ass'n,* 460 U.S. 37, 46-47 (1983).

Plaintiff Debra Gassman ("Plaintiff" or "Gassman") alleges that she seeks to display her photo "on top of the employee mailboxes" and in her "internal office," neither of which are "visible to members of the public." Dkt. 1 at ¶¶ 29, 32. She thereby admits that the areas in which she seeks to display her photo are nonpublic fora.

2. Employers may place reasonable restrictions on speech in the workplace.

In nonpublic fora, "while a public entity may not censor speech about an authorized topic based on the point of view expressed by the speaker, it has broad discretion to preserve the property under its control for the use to which it is lawfully dedicated." *Good News Club v. Milford Central School,* 533 U.S. 98, 130–31 (2001). In the context of the workplace, courts give public employers wide latitude in maintaining discipline and the management of their personnel and internal affairs, even when the speech at issue is of public concern. *Connick*, 461 U.S. at 151-53.

The test for whether such restrictions are constitutional is whether they are "reasonable in light of the purpose served by the forum" and "not an effort to suppress expression <u>merely because</u> public officials oppose the speaker's view." *Minnesota Voters All. v. Mansky*, 585 U.S. 1, 2 (2018); *Perry*, 460 U.S. at 46 (emphasis added). Employers have even more latitude in placing manner, time and place restrictions on employee speech when the speech violates an "announced office policy." *Connick*, 461 U.S. at 153 (1983) (*citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. at 284).

When exercising this wide discretion in maintaining discipline and protecting close working relationships, public employers need not demonstrate actual disruption to the workplace before

2

enforcing a reasonable rule. *Connick*, 461 U.S. at 151–52 ("we do not see the necessity for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action").

The fact that the employer restricts a symbolic expression that communicates a particular message, or that the restriction involves interpretation of the message, does not mean the restriction is content-based. *Virginia v. Black*, 538 U.S. 343, 360–61 (2003). The question is whether the restriction seeks to impose a neutral rule, as opposed to promoting one view over another. *Id.*; *Perry*, 460 U.S. at 49.

 B. Defendants appropriately enforced the office's Violence in the Workplace Policy in requiring Gassman to relocate her photo.

Defendants' reasons for asking Gassman to move her photo out of public view are explained in the complaint itself, and their reasonableness is apparent from the complaint's allegations. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) ("Our case law recognizes that a party may plead itself out of court by pleading facts that establish an impenetrable defense to its claims.").

 1. Defendants explain why they asked for the relocation of the photo of an Israeli soldier carrying an M-16.

On October 20, 2023, Public Defender Sharone Mitchell wrote to Plaintiff about the display "of a picture of yourself holding what appears to be a firearm . . . in public view of others who work at the Skokie Courthouse." Dkt. 1-2. Mitchell explained that "[d]isplays of firearms can be perceived as threatening" and are inconsistent with the Workplace Violence Policy in the Employee Manual. *Id.* He therefore asked Plaintiff to "remove any firearm related picture from public view." *Id.*

The Violence in the Workplace Policy seeks to ensure a "work environment that is free from violence or threats of violence against employees, clients, and guests of the Law Office of their property and property of the Law Office." Dkt. 1-3 at p. 61. It seeks to maintain a work environment that "promotes professionalism" and defines workplace violence as including but not

3

limited to "a single behavior or a series of behaviors which constitute . . . <u>intimidation</u>, threats or similar actions . . . which occurs in a Law Office worksite . . . ." Dkt. 1-3 at p. 61 (emphasis added).

Plaintiff also alleges (and Defendants' Motion to Dismiss does not address this allegation) that CCPD Deputies "claimed that this photograph could provoke violence and was akin to displaying a Nazi swastika" and that "executive management (Rodney Carr and Parle Roe-Taylor)" also told her the photograph "was comparable to a Nazi swastika." Dkt. 1 ¶¶ 5, 31. Plaintiff claims these comments are illustrations of the Public Defender's office's "censorship of her right to express herself," in particular the photo's "core message--that Israel and Jewish people have the right not to be exterminated." Dkt. 1 ¶¶ 39, 49.

Plaintiff's allegation that the intent behind the enforcement of the Public Defender's anti-violence policy is censorship of the idea that the Jewish people have a "right not to be exterminated" (Dkt. 1 ¶ 39) is not plausible. In reviewing the plausibility of allegations, "[i]f the allegations give rise to an obvious alternative explanation, then the complaint may stop short of the line between possibility and plausibility of entitlement to relief." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (internal citations and quotation marks removed).

The obvious alternative explanation, as Gassman's allegations make clear, is that the Public Defender sought to remove from view of its staff, a threatening and intimidating photo symbolizing violence against a particular ethnic group. Defendants' explanations about their reasons for restricting the placement of Gassman's "Israeli Defense Forces" ("IDF") photo are consistent with the employment policies attached to Plaintiff's complaint, as discussed below.

2. Gassman's IDF photo contains imagery that alludes to the violent exclusion of a group based on ethnicity/religious affiliation.

Although the word "Palestinian" appears neither in Gassman's complaint nor in Defendants' Motion to Dismiss, that is of course the ethnic group that is the target of IDF guns such as the one

4

that appears in Gassman's picture. The implication throughout the complaint that those guns are used exclusively for defensive purposes is not plausible.

This Court may consider "matters of which judicial notice may be taken" under Fed. R. Evidence 201(b). This exception allows the consideration of facts which are "generally known", or facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FRE 201(b). The exception also allows judges to take judicial notice of newspaper and online articles. *See Schmude v. Sheahan*, 312 F. Supp. 2d 1047 (N.D. Ill. 2004) (Norgle, J.) (recognizing that it is "routine for courts to take judicial notice of both newspaper articles and court records, among other things") (*citing Medhin v. Ashcroft*, 350 F.3d 685, 690 (7th Cir. 2003) (taking judicial notice of State Department report of Ethiopia); *Chhetry v. U.S. Dep't of Just.*, 490 F.3d 196, 199 (2d Cir. 2007) (finding no error in the Board of Immigration Appeals taking administrative notice of news articles on current events in assessing an asylum application).

Gassman alleges she volunteered for the IDF in 2002 and subsequently for the Jerusalem border police (the "Magav") in 2005 and 2006, and that the photo at issue was taken while she was serving in her former capacity. Dkt. 1 ¶¶ 16-18. There is abundant evidence in the public record, including in United Nations documents, State Department reports, Israeli and international human rights organization reports, and Israeli and international news articles, which NLG-Chicago only summarizes in very cursory form here, which demonstrates the reasonableness of the Public Defender having interpreted Gassman's photo as violent and threatening. NLG-Chicago does not ask the Court to adopt those records as true, but rather introduces them as examples of information that is publicly available, and which bears on the reasonableness of Defendants' actions.

The IDF has its origins in Jewish nationalist military organizations which developed Plan Dalet, a strategy for emptying Palestine of its non-Jewish populations, and succeeded in depopulating more

5

than 400 Palestinian villages, starting before the war of 1948.[1] The first part of this plan, Operation Nachshon, "was the first operation in which all various Jewish military organizations endeavored to act together as a single army – providing the basis of the future Israeli Defence Forces (IDF)."[2]

Through the years since its inception, the IDF (and the Magav) continued to use violence and control to militarily occupy Palestinian territory, expel Palestinians from their land and suppress organized Palestinian efforts at self-determination. As an early example, the Magav committed a massacre in the village of Kafr Qasim in 1956, killing 49 men, women and children.[3]

In more recent decades as well, the IDF and the Magav have an exhaustively-documented history of intentionally killing Palestinians, including children, and those defending their rights.[4] In 2002, the year in which Gassman volunteered for the IDF, the IDF invaded Jenin refugee camp in the West Bank and engaged in indiscriminate killing and other violence, launching missiles at civilians in areas where there were no fighters in the immediate vicinity and destroying at least 140 buildings with armored bulldozers, most of them multi-unit residential buildings.[5] This property damage also involved the killing of civilians. For example,

> Jamal Fayid, a thirty-seven-year-old paralyzed man, was killed when the IDF bulldozed his home on top of him, refusing to allow his relatives the time to remove him from the home. Sixty-five-year-old Muhammad Abu Saba'a had to plead with an IDF bulldozer operator to stop demolishing his home while his family remained inside; when he returned to his half-demolished home, he was shot dead by an Israeli soldier.[6]

---

[1] ILAN PAPPE, THE ETHNIC CLEANSING OF PALESTINE 39-41 (2006); *see also* DAVID HIRST, THE GUN AND THE OLIVE BRANCH 248-49 (3d Ed. 2003); *see also* WALID KHALIDI, Ed., ALL THAT REMAINS (1992).
[2] Pappe at p. 88.
[3] *See* Adel Manna, *Kafr Qasim – 1956*, INTERACTIVE ENCYCLOPEDIA OF THE PALESTINE QUESTION, https://www.palquest.org/en/highlight/14334/kafr-qasim-1956.
[4] *See e.g.* Human Rights Council, *Report of the detailed findings of the independent international Commission of inquiry on the protests in the Occupied Palestinian Territory*, A/HRC/40/CRP.2, Fortieth session 25 February–22 March 2019, https://digitallibrary.un.org/record/3798961?ln=en&v=pdf ("Several children were recognizable as such when they were shot. The Commission finds reasonable grounds to believe that Israeli snipers shot them intentionally, knowing that they were children.") (last accessed July 5, 2024).
[5] Human Rights Watch, *Jenin Military Operations*, May 2, 2002, https://www.hrw.org/report/2002/05/02/jenin/idf-military-operations (last accessed June 25, 2024).
[6] *Id.*

In a similar invasion in Nablus in March and April of 2002, the IDF killed 80 people, including nine children under the age of 15, through what Amnesty International called "circumstances suggesting that they were unlawfully and deliberately targeted, or were killed as a result of disproportionate use of force or gross negligence in protecting those not or no longer involved in the fighting."[7] In Jenin and Nablus, the IDF cut off civilian access to electricity and water for weeks, tortured civilians in mass roundups, and used men and women as "human shields."[8]

In 2003, roughly the time of Gassman's service, the IDF crushed to death with a bulldozer American citizen Rachel Corrie while she was protesting the demolition of a Palestinian-owned house in Gaza, using a bullhorn and wearing a brightly-colored vest.[9] During the years Gassman was volunteering for the Magav, there were several reports of unjustified violence against Palestinians, such as in November 2005, when an Israeli border police officer shot Samir Ribhi Da'ari in the back.[10] In 2009, the United Nations Human Rights Council issued a Report of the United Nations Fact-Finding Mission on the Gaza Conflict which detailed deliberate IDF attacks on civilians, including "the shooting of civilians while they were trying to leave their homes to walk to a safer place, waving white flags and, in some of the cases, following an injunction from the Israeli forces to do so."[11] In 2014, the IDF launched 5,242 airstrikes and a 20-day military ground operation in Gaza,

---

[7] Amnesty International, *Israel and the Occupied Territories: Shielded from scrutiny: IDF violations in Jenin and Nablus*, November 4, 2002, https://www.amnesty.org/en/documents/mde15/143/2002/en/ (last accessed June 25, 2024).

[8] *Id.*

[9] Human Rights Watch, *World Report 2013: Israel/Palestine*, https://www.hrw.org/world-report/2013/country-chapters/israel/palestine (last accessed Jun 26, 2024); *see also* Andrew Bumbcombe, *Rachel Corrie was killed in Gaza by the IDF. 20 years on, her parents are still fighting for justice*, THE INDEPENDENT, March 17, 2023, https://www.independent.co.uk/news/world/americas/rachel-corrie-death-parents-gaza-idf-b2303078.html.

[10] United States Department of State, *Israel and the occupied territories*, 2006 Country Reports on Human Rights Practices, March 6, 2007, https://2009-2017.state.gov/j/drl/rls/hrrpt/2006/78854.htm (last accessed June 25, 2024).

[11] United Nations General Assembly, Human Rights Council, *HUMAN RIGHTS IN PALESTINE AND OTHER OCCUPIED ARAB TERRITORIES: Report of the United Nations Fact-Finding Mission on the Gaza Conflict*, A/HRC/12/48, September 25, 2009 at p. 20 ¶ 43, https://www.ohchr.org/en/hr-bodies/hrc/special-sessions/session9/fact-finding-mission (last accessed July 5, 2024).

7

killing 1,483 civilians, including 521 children.[12] The IDF also routinely arrests Palestinian children, 61 of whom are currently being held in Israeli prisons without charge or trial.[13]

IDF violence has escalated dramatically since October 7, 2023, as has the genocidal rhetoric of Israeli government and IDF officials. A few examples of Israeli officials' violent rhetoric include:

- IDF spokesperson Rear Admiral Daniel Hagari admitted on October 10, "[T]he emphasis is on damage and not on accuracy."[14]

- Prime Minister Netanyahu: "This is a battle not only of Israel against these barbarians, it's a battle of civilization against barbarism."[15]

- Prime Minister Netanyahu invoked the Biblical story of the total destruction of Amalek by the Israelites, stating, on November, 3, 2023 to Israeli soldiers and officers as they prepared to enter Gaza, "Spare no one, but kill alike men and women, infants and sucklings . . . ."[16]

- Minister of National Security Itamar Ben Gvir (who oversees the Magav): "As long as Hamas does not release the hostages it is holding - the only thing that needs to enter Gaza is hundreds of tons of explosives by the Air Force, and not an ounce of humanitarian aid."[17]

That violent rhetoric was accompanied by actual extreme violence. That violence includes but is not limited to targeted airstrikes against journalists (more journalists than were killed in all of World

---

[12] United States Department of State, *Country Reports on Human Rights Practices for 2014, Israel and The Occupied Territories,* https://2009-2017.state.gov/j/drl/rls/hrrpt/2014humanrightsreport/ (last accessed June 26, 2024).
[13] Defense for Children International Palestine, *Number of Palestinian Children (12 - 17) in Israeli Administrative Detention*, April 29, 2024, https://www.dci-palestine.org/children_in_israeli_administrative_detention (last accessed July 5, 2024); *see also* B'Tselem, the Israeli Information Center for Human Rights in the Occupied Territories, *Statistics on Palestinian minors in Israeli custody*, November 20, 2023, https://www.btselem.org/statistics/minors_in_custody (last accessed July 5, 2024).
[14] Bethan McKernan *&* Quique Kierszenbaum, *'We're focused on maximum damage': ground offensive into Gaza seems imminent*, THE GUARDIAN, October 10, 2023, https://www.theguardian.com/world/2023/oct/10/right-now-it-is-one-day-at-a-time-life-on-israels-frontline-with-gaza (last accessed June 25, 2024).
[15] Ministry of Foreign Affairs, Christmas message from PM Netanyahu, https://www.gov.il/en/pages/christmas-message-from-pm-netanyahu-24-dec-2023 (last accessed July 5, 2024).
[16] The Government of the Republic of South Africa, *Application Instituting Proceedings, International Court of Justice*, December 28, 2023, https://www.icj-cij.org/sites/default/files/case-related/192/192-20231228-app-01-00-en.pdf (last accessed July 4, 2024).
[17] @itamarbengvir, X, (October 17, 2023, 1:00 p.m.), https://twitter.com/itamarbengvir/status/1714340519487176791 (last accessed July 5, 2024).

8

War II)[18] and humanitarian aid workers,[19] point-blank executions of civilians,[20] the widespread arrest and detention of civilians (including an 82-year-old woman who suffers from Alzheimer's disease[21]) and the indiscriminate bombing of civilian infrastructure, including in designated "safe areas,"[22] as well as schools sheltering displaced people[23] and hospitals.[24] During the last nine months alone, the IDF has killed more than 38,000 people in Gaza.[25] That includes nearly 16,000 children,[26] such as

---

[18] International Federation of Journalists, *Ninety-four journalists killed in 2023, says IFJ*, December 8, 2023, https://www.ifj.org/media-centre/news/detail/category/press-releases/article/ninety-four-journalists-killed-in-2023-says-ifj (last accessed July 4, 2024); Hoda Osman, Firas Taweel, & Farah Jallad, *Israel's War on Gaza is the Deadliest Conflict on Record for Journalists,* THE INTERCEPT, June 25, 2024, https://theintercept.com/2024/06/25/israel-gaza-war-journalists-killed/#:~:text=He%20is%20among%20the%20more,II%2C%20which%20lasted%20six%20years (last accessed July 4, 2024).

[19] United Nations Security Council, *Press Statement on Humanitarian Workers and Threat of Famine in Gaza*, MEETINGS COVERAGE AND PRESS RELEASES, April 11, 2024, https://press.un.org/en/2024/sc15658.doc.htm (last accessed July 4, 2024).

[20] Leila Warah, *Civilians Reportedly Killed Execution-Style While Sheltering in a Gaza School*, TRUTHOUT, December 14, 2023, https://truthout.org/articles/civilians-reportedly-killed-execution-style-while-sheltering-in-a-gaza-school/ (*citing* ALJAZEERA, *Civilians sheltering inside a Gaza school killed execution-style*, https://www.aljazeera.com/program/newsfeed/2023/12/13/civilians-sheltering-inside-a-gaza-school-killed-execution) (last accessed July 4, 2024).

[21] Amira Hass, *Israel Held 82-year-old Gaza Woman With Alzheimer's for Two Months as an 'Unlawful Combatant'*, HAARETZ, February 1, 2024, https://www.haaretz.com/israel-news/2024-02-01/ty-article/.premium/israel-held-gaza-woman-82-with-alzheimers-for-two-months-as-an-unlawful-combatant/0000018d-613a-de6e-a79f-73bbc94d0000 (last accessed July 5, 2024).

[22] Robin Stein, Haley Willis, Ishaan Jhaveri, Danielle Miller, Aaron Byrd & Natalie Reneau, *A Times Investigation Tracked Israel's Use of One of Its Most Destructive Bombs in South Gaza*, The New York Times, December 21, 2023, https://www.nytimes.com/2023/12/21/world/middleeast/israel-gaza-bomb-investigation.html (last accessed July 4, 2024).

[23] Victoria Beaule, *Israeli airstrike kills 8 people in Gaza City: Gaza Ministry of Health*, ABC NEWS, June 23, 2024, https://abcnews.go.com/International/live-updates/israel-hamas-war-gaza-US?id=111357096&entryId=111355327 (last accessed July 5, 2024).

[24] The Office of the High Commissioner for Human Rights, *Israel/Gaza: UN experts deplore attacks on Al-Shifa Hospital, urge States to stop the massacre*, April 4, 2024, https://www.ohchr.org/en/statements-and-speeches/2024/04/israelgaza-un-experts-deplore-attacks-al-shifa-hospital-urge-states (last accessed July 5, 2024); *see also* World Health Organization, *WHO statement on attack on Al Ahli Arab Hospital and reported large-scale casualties*, October 17, 2023, https://www.who.int/news/item/17-10-2023-who-statement-on-attack-on-al-ahli-arab-hospital-and-reported-large-scale-casualties (last accessed July 5, 2024).

[25] United Nations Office for the Coordination of Humanitarian Affairs, *Humanitarian Situation Update #187 | Gaza Strip*, July 5, 2024, https://www.ochaopt.org/content/humanitarian-situation-update-187-gaza-strip (last accessed July 5, 2024).

[26] Defense for Children International Palestine, *Gaza students miss secondary school exams amid ongoing Israeli genocide*, June 26, 2024, https://www.dci-palestine.org/gaza_students_miss_secondary_school_exams_amid_ongoing_israeli_genocide (last accessed July 5, 2024).

9

eight-month-old Misk Joudeh, pictured here with her brother Khaled, whose mother, father, and older brother were also killed by the IDF while they were sleeping.[27] Khaled whispered to his sister as he said goodbye, "Mama was so happy when she had you."[28]



IDF tanks also killed 6-year-old Hind Rajab, who was trapped in a car for hours with the corpses of five of her family members, on the phone with rescue workers begging for help. The rescue workers received approval from and coordinated their rescue route with the Israeli authorities, but

---

[27] Raja Abdulrahim, *The War Turns Gaza Into a 'Graveyard' for Children*, THE NEW YORK TIMES, November 18, 2023, https://www.nytimes.com/2023/11/18/world/middleeast/gaza-children-israel.html (last accessed July 5, 2024).
[28] *Id.*

10

an Israeli tank killed Hind and the two ambulance workers who tried to save her.[29] Forensic evidence showed 335 close-range bullet holes on the car.[30]

In the days immediately following two interim rulings of the International Court of Justice ("ICJ") as it considered South Africa's pending case of genocide against Israel, the IDF escalated its violence. On January 27, 2024, the day after the ICJ ruled that South Africa's genocide claims were "plausible,"[31] the IDF killed 174 people in Gaza.[32] In the 48 hours after the ICJ's May 24, 2024 order that Israel "immediately" halt its bombardment of Rafah, the IDF launched 60 air raids on Rafah and continued restricting the entry of humanitarian aid.[33] Then, slightly more than 48 hours after the ruling, the IDF bombed a refugee camp it had previously designated as safe zone, killing 45 people, including children, some of whom were burned alive and dismembered by the explosion.[34]

---

[29] Aljazeera, *Israeli tank fired at Hind Rajab family car from metres away: Investigation*, June 23, 2024, https://www.aljazeera.com/news/2024/6/23/israeli-tank-fired-at-hind-rajab-family-car-from-metres-away-investigation (last accessed July 3, 2024); Ali Sawafta and Henriette Chacar, *Unknown fate of Palestinian girl, ambulance team highlights Gaza rescue challenges*, REUTERS, February 1, 2024, https://www.reuters.com/world/middle-east/unknown-fate-palestinian-girl-ambulance-team-highlights-gaza-rescue-challenges-2024-02-01/ (last accessed July 3, 2024).

[30] Forensic Architecture, *The Killing of Hind Rajab*, June 21, 2024, https://forensic-architecture.org/investigation/the-killing-of-hind-rajab (last accessed July 3, 2024).

[31] International Court of Justice, Order, *APPLICATION OF THE CONVENTION ON THE PREVENTION AND PUNISHMENT OF THE CRIME OF GENOCIDE IN THE GAZA STRIP*, January 26, 2024, https://static01.nyt.com/newsgraphics/documenttools/e9d8337ab5ae1d92/72977573-full.pdf (last accessed July 4, 2024).

[32] Nidal Al-Mughrabi & Fadi Shana, *South Gaza battles rage as heavy rain hits displaced further north*, REUTERS, January 27, 2024, https://www.reuters.com/world/middle-east/south-gaza-battles-rage-heavy-rain-hits-displaced-people-further-north-2024-01-27/ (last accessed July 5, 2024).

[33] Euro-Med Human Rights Monitor, Gaza: *After ICJ order to halt attacks on Rafah, Israel launches over 60 air raids on the city in 48 hours*, May 26, 2024, https://euromedmonitor.org/en/article/6348/Gaza:-After-ICJ-order-to-halt-attacks-on-Rafah,-Israel-launches-over-60-air-raids-on-the-city-in-48-hours (last accessed July 5, 2024).

[34] Miriam Berger & Hajar Harb, *Eyewitnesses describe horrific scenes after Israeli strike on Rafah camp*, THE WASHINGTON POST, May 27, 2024, https://www.washingtonpost.com/world/2024/05/27/rafah-strike-israel-displaced-palestinians/ (last accessed July 5, 2024).



35

At the end of May of 2024, 42 Israeli army reservists signed onto a letter declaring their refusal to continue serving in Gaza. One of them told the Israeli newspaper Haaretz how easy it was to get permission to bomb and shoot in Gaza, saying, "[T]he vibe is 'You can fire wherever you want. You have to get permission, but there will be permission. It's only bureaucratic.' I can count on one hand the times when we were told: 'You can't fire there.' "[36]

The IDF's violence is not confined to Gaza. Since October 7, 2023 alone, the IDF and Israeli settlers have killed 539 Palestinians, including 131 children, in the West Bank.[37] In October of last

---

[35] Photo Source: Hani Alshaer/Anadolu/Getty Images, https://newrepublic.com/article/181996/rafah-strike-gaza-laws-war-mockery (last accessed July 5, 2024).
[36] Liza Rozovsky, *Three Israeli Army Reservists Explain Why They Refuse to Continue Serving in Gaza*, HAARETZ, June 27, 2024, https://www.haaretz.com/israel-news/2024-06-27/ty-article-magazine/.premium/three-israeli-army-reservists-explain-why-they-refuse-to-continue-serving-in-gaza/00000190-5014-d3c0-a5d4-737644c90000 (last accessed July 3, 2024).
[37] United Nations Office for the Coordination of Humanitarian Affairs, *Humanitarian Situation Update #186 | West Bank*, https://www.ochaopt.org/content/humanitarian-situation-update-186-west-bank

year, for example, in the West Bank town of Tulkarem, Israeli forces "opened fire on a crowd of at least 80 unarmed Palestinians peacefully demonstrating in solidarity with Gaza" including on journalists and people trying to run away from the gunfire.[38]

Gassman alleges that the photo of her posing with an IDF assault rifle could not be interpreted as violent or threatening. She writes, "CCPD management likewise was well-aware that Debra would never advocate violence. Debra is a peaceful, caring person who has promoted peace in disputes- both in and out of court." Dkt. 1 ¶ 48. Although Gassman's having refrained from assaulting people in court is certainly to her credit, that does not render her photo nonviolent, not only because the photo itself shows Gassman wielding an assault rifle but because IDF weapons are routinely used to kill Palestinian civilians who pose no threat to anyone, as described *supra*. See *Parsons v. Pitzer*, 149 F.3d 734, 738 (7th Cir. 1998) (recognizing the "inherently violent nature of firearms"). It is therefore reasonable to interpret Gassman's gun photo as a violent, threatening, and intimidating symbol.

The particular nature of the Public Defender's restriction– removing the photo from view of others– was also reasonable. As Gassman's allegations demonstrate, she does not work in isolation. Although she describes her office as a "private office" (Dkt. 1 ¶¶ 5, 32, 34) and characterizes it as outlandish to think someone could "gain entry" into her office and see the photo (*Id.* at ¶ 37), other allegations in the complaint show that Gassman works with others and others in the office have seen the photo and "commented favorably" on it. Dkt. 1 ¶¶ 13, 22. Gassman also alleges that the purpose of displaying the photo is so that others in the office can see it. Dkt. 1 ¶¶ 4, 29.

Plaintiff's representations of the Public Defender's explanations for the restriction are perfectly compatible with Plaintiff's claimed core message, namely the right of Jewish people not to be

---

[38] Amnesty International, *Shocking spike in use of unlawful lethal force by Israeli forces against Palestinians in the occupied West Bank*, February 5, 2024, https://www.amnesty.org/en/latest/news/2024/02/shocking-spike-in-use-of-unlawful-lethal-force-by-israeli-forces-against-palestinians-in-the-occupied-west-bank/ (last accessed June 25, 2024).

13

exterminated. The alleged stated rationale of the CCPD Deputies, Carr and Roe-Taylor, in fact, references that core message; they allude to the example of the Nazi swastika as support for the principle that imagery which represents violent exclusion based on religious affiliation or membership in a racial/ethnic group is not acceptable in the workplace. Such a proposition is consistent not only with the Public Defender's anti-violence policy but with its policy prohibiting discrimination based on national origin and religion. Dkt. 1-3 at p. 18.

The analogy between the Nazi genocide and the Israeli genocide has been made by others as well, including Israeli officials who are participants in that violence. The International Court of Justice issued an interim ruling characterizing South Africa's allegations of genocide against Israel as "plausible."[39] Former head of the Israeli National Security Council Giora Eiland referred to Gaza as "a huge concentration camp" and is currently calling for the eradication of the entire population.[40] Scholar Norman Finkelstein, the son of Holocaust survivors, also describes Gaza as a "concentration camp," which he says Israel maintains in service of ethnic cleansing and maintaining a Jewish majority in Israel.[41] David Azoulai, the mayor of the Israeli town of Metula, said in an interview on December 17, 2023, "The whole Gaza Strip needs to be empty. Flattened. Just like in Auschwitz. Let it be a museum for all the world to see what Israel can do."[42]

---

[39] ICJ Order, January 26, 2024.
[40] Jonathan Ofir, *Influential Israeli national security leader makes the case for genocide in Gaza*, MONDOWEISS, November 20, 2023, https://mondoweiss.net/2023/11/influential-israeli-national-security-leader-makes-the-case-for-genocide-in-gaza/ (last accessed July 4, 2024).
[41] Jeremy Scahill, *Blacklisted Academic Norman Finkelstein on Gaza "The World's Largest Concentration Camp,"* THE INTERCEPT, May 20, 2018, https://theintercept.com/2018/05/20/norman-finkelstein-gaza-iran-israel-jerusalem-embassy/ (last accessed July 5, 2024).
[42] Canaan Lidor, *Israeli mayor calls for turning Gaza into 'Auschwitz-like' museum, prompting rebuke*, THE TIMES OF ISRAEL, December 18, 2023, https://www.timesofisrael.com/liveblog_entry/israeli-mayor-calls-for-turning-gaza-into-auschwitz-like-museum-prompting-rebuke/ (last accessed July 5, 2024).

C. Discomfort is not an adequate reason for the restriction of speech.

Defendants assert that part of the reason the restriction of Gassman's violent photograph is reasonable is that colleagues who saw the photo might "feel uncomfortable" (Dkt. 8 at p. 8). NLG-Chicago wishes to emphasize– without claiming that Defendants are so arguing– that mere discomfort would not be a sufficient reason for the restriction of speech.

To justify prohibition of the expression of opinion, the government "must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." *Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 509 (1969); *St. v. New York*, 394 U.S. 576, 592 (1969) ("It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers."); *see also Virginia*, 538 U.S. at 358.

What makes the Public Defender's restriction here reasonable is not merely that the photo might make people uncomfortable, but that the Public Defender has a right to enforce neutral rules protecting its employees from the display of threatening and intimidating symbols of violence.

Although Palestinians in Gaza and the West Bank have no choice but to live under the gun of the IDF and the Magav, employees of the Office of the Public Defender need not. For all these reasons, NLG Chicago respectfully requests that this Court dismiss this case.

Respectfully submitted,

National Lawyers Guild Chicago,
*Amicus Curiae*

By:

s/ Rima N. Kapitan
Atty No. 6286541
Kapitan Gomaa Law, P.C.
Phone: (312) 566-9590
rima@kapitangomaa.com

15