IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DEBRA GASSMAN, | ) |
| Plaintiff, | ) |
| | ) Case No. 24 C 01279 |
| v. | ) |
| | ) Judge Joan H. Lefkow |
| COOK COUNTY and SHARONE R. MITCHELL, JR., solely in his Official Capacity as the PUBLIC DEFENDER OF COOK COUNTY, | ) |
| Defendants. | ) |

**OPINION AND ORDER**

Debra Gassman brings this action under 42 U.S.C. § 1983 against Cook County, Illinois, and Sharone R. Mitchell, Jr. in his official capacity as the Public Defender of Cook County ("Public Defender" or "CCPD") (collectively, "Defendants").[1] Gassman alleges that the Public Defender violated her First and Fourteenth Amendment rights by censoring her speech and enforcing employee policies that prevent her from discussing the alleged censorship with the media. In a separate count, Gassman seeks indemnification against Cook County. Defendants move to dismiss Gassman's complaint under Federal Rule of Civil Procedure 12(b)(6). (Dkt. 8.) For the reasons stated below, the court grants the motion in part and denies it in part.

**BACKGROUND**[2]

Debra Gassman is an Assistant Public Defender for the Public Defender of Cook County, Illinois. She has been employed as a lawyer by the Public Defender since 1997 and worked as an

---

[1] Jurisdiction is proper under 28 U.S.C. § 1343. Venue is proper under 28 U.S.C. §§ 1391(b)(1), b(2).

[2] The court only includes allegations that are relevant to Defendants' motion to dismiss. Gassman's well-pleaded allegations are accepted as true. *Chaidez* v. *Ford Motor Co.*, 937 F.3d 998, 1004 (7th Cir. 2019).

intern and law clerk at the office beforehand. Gassman is Jewish and "devoted to Israel." (Dkt. 1 ¶ 15.)

In 2002, Gassman volunteered for the Israel Defense Forces ("IDF"). In December of 2002, during her volunteer stint, Gassman took a photograph of herself holding a gun in front of an Israeli flag ("the photo"). The photo was taken in Tel HaShomer, an army base near Tel Aviv. The photo is approximately 11 inches tall. It is reproduced below:



(Dkt. 1-1.)

When Gassman returned from Israel in 2002, she prominently displayed the photo in her shared office at the Leighton Criminal Courthouse in Chicago. The photo reminds Gassman of her time spent defending Israel and the Jewish people. To Gassman, the photo signals that the Jewish people must "stay strong" when threatened by other nations. (Dkt. 1 ¶ 20.) The photo

2

remained there, undisturbed, until she transferred to the Public Defender's office in Skokie, Illinois, in October 2020. In Skokie, Gassman again displayed the photo in her shared office "without incident." (*Id.* ¶ 19.)

On October 7, 2023, Hamas terrorists invaded Israel and attacked civilians. Gassman was "devastated, shocked, and scared by the October 7 attacks." (*Id.* ¶ 25.) She returned to work on October 10th. Upon returning, Gassman felt upset that "few seemed to care—or even were aware of"—the attack on Israel. (*Id.* ¶ 28.) "[T]o bring attention to the attacks that had occurred in Israel and the need to support the victims," Gassman brought the photo out of her office and placed it on top of the employee mailboxes for her coworkers to see. (*Id.* ¶ 29.) Gassman positioned the photo so that it faced the back of the office toward the staff; it was not visible to the public. Public Defender employees regularly display items such as holiday decorations, photographs, art, and cards in the same area.

When executive management (Cook County Deputy Public Defender Parle Roe-Taylor and Rodney Carr[3]) learned of the photo, they instructed the Public Defender "Chief" to remove it. (*Id.* ¶¶ 31, 34.) Carr and Roe-Taylor told Gassman's supervisors that the photo was "comparable to a Nazi swastika." (*Id.* ¶ 31.) Gassman removed the photo and returned it to her private office, where she continued to display it. The photo was "not visible to members of the public." (*Id.* ¶ 32.)

On October 20, 2023, Mitchell issued a written reprimand to Gassman. The reprimand explained that Gassman's display of a photograph depicting a firearm "can be perceived as threatening and therefore is[] inconsistent" with the Public Defender Employee Manual ("Employee Manual") policy regarding workplace violence. (Dkt. 1 ¶ 33; Dkt. 1-2 at 2; Dkt. 1-3

---

[3] Carr's title is not alleged in the Complaint.

at 61.) The reprimand further noted, "tragic world events likely motivated this display and may have compromised your judgment. We have considered this in our decision not to pursue any disciplinary action at this time." (Dkt. 1-2 at 2.)

On October 30, Roe-Taylor went to the Skokie office. While Gassman worked in court, Roe-Taylor entered Gassman's office and confiscated the photo. Roe-Taylor then requested a meeting with Gassman and "[her] Chief." (Dkt. 1 ¶ 35.) Roe-Taylor conveyed that the photo amounted to displaying a firearm in public view.

Gassman's Chief obtained the photo and returned it to Gassman but instructed that it could not be displayed inside her office as she had done previously. Executive management further explained that the photo could not be placed where "anyone might see it from any angle of the entryway to her office." (*Id.*) The photo was not in public view, however, when Roe-Taylor confiscated it. Gassman's office is in the back corner of the Skokie office and rarely visited. Gassman does not use her office to meet with clients.

The Public Defender generally permits employees to display pictures and other messages inside their offices without censorship or regulation. Public Defender employees have even been permitted to display photographs of guns that did not depict the Israeli flag. A senior supervisor, for instance, once emailed an image of a film character pointing a gun at another to approximately twenty public defenders. The email included the joking remark: "[W]e all know what can happen when there is a difference of opinion." (*Id.* ¶ 46.) Additionally, Public Defender employees have placed signage in the Public Defender's office to celebrate favorable verdicts. Images from these congratulatory posts sometimes depict weapons, including guns. The Public Defender has also permitted employees to possess actual weapons in their offices, such as guns and swords.

To Gassman's knowledge, no Public Defender employee has ever been restricted from displaying a photograph of a weapon. Moreover, no one ever complained that the photo was distressing or inappropriate until the events described in her Complaint. To the contrary, those who observed the photo commented favorably on it and expressed admiration for her service in the IDF.

Gassman also alleges that the Employee Manual prevents her from discussing this alleged censorship publicly. She specifically wishes to speak to the media regarding Public Defender "policies, procedures, and other 'general matters,'" including the Public Defender's "utilization of its internal policies to prohibit her from displaying the photo." (*Id.* ¶ 57.) The Employee Manual regulates employee conduct and includes policies covering public relations and media ("Public Relations/Media Policy") and social media communications ("Social Media Policy").

The Public Relations/Media Policy prohibits employees from initiating contact with the media "regarding policies, procedures, or the Office's positions on general matters, or regarding a particular case." (*Id.* ¶ 53; Dkt. 1-3 at 72.) Similarly, it provides, "Only the Public Defender or designee may speak to the media about the Law Office's policies, procedures or official positions on general matters." (Dkt. 1 ¶ 54; Dkt. 1-3 at 72.) The Social Media Policy requires individuals "identify[ing] themselves as employees of the Cook County Public Defender's Office" to "be respectful" and, "[b]efore sharing a comment, post, picture or video through social media," seek consent of any people or organizations identified. (Dkt. 1 ¶ 56; Dkt. 1-3 at 75.) The Employee Manual states, "Failure to comply with any policy may subject the employee to discipline up to and including termination of employment." (Dkt. 1 ¶ 58; Dkt. 1-3 at 3.)

Gassman seeks a declaratory judgment stating that the Public Defender's conduct is "unlawful and in violation of her First and Fourteenth Amendment rights." (Dkt. 1 at 14.)

Gassman further asks the court to issue an order permitting her to "prominently display" the photo in her office, in addition to attorney's fees, costs, and "all relief available to Plaintiff under the law." (*Id.*)[4] At oral argument, counsel for Gassman clarified that she seeks damages.

## **LEGAL STANDARD**

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests whether the complaint states a claim on which relief may be granted." *Richards* v. *Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012); Fed. R. Civ. P. 12(b)(6). Under Federal Rule of Civil Procedure 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555 (2007) (citation omitted).

The court accepts as true the complaint's well-pleaded allegations and draws all reasonable inferences in the plaintiff's favor. *Chaidez*, 937 F.3d at 1004. To survive a Rule 12(b)(6) motion, the complaint must establish that the requested relief is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Taha* v. *Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). When evaluating a Rule 12(b)(6) motion, the court "may examine exhibits … attached to the complaint, or referenced in the pleading if they are central to the claim." *Esco* v. *City of Chicago*, 107 F.4th 673, 678 (7th Cir. 2024).

---

[4] The court has allowed the Chicago Chapter of the National Lawyers Guild and the StandWithUs Saidoff Legal Department, a division of StandWithUs, to file amicus briefs. The National Lawyers Guild supports the position of the Public Defender. StandWithUs supports Gassman.

**DISCUSSION**

I.     **First Amendment Claim – 42 U.S.C. § 1983**

The First Amendment provides, as relevant here: "Congress shall make no law … abridging the freedom of speech." U.S. CONST. AMEND. I. States are similarly forbidden from enacting such laws by incorporation of the First Amendment to the states through the Fourteenth Amendment. *See, e.g.*, *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 516 (1996) (holding that Rhode Island's complete ban on advertising abridged speech in violation of the First Amendment "as made applicable to the States by the Due Process Clause of the Fourteenth Amendment"). Gassman identifies two factual theories in support of her First Amendment claim. The first involves her speech with respect to the photo, when the Public Defender required Gassman to remove it from the mailbox area, confiscated it from her office, and then prohibited her from prominently displaying it.[5] Her second theory alleges that the Employee Manual amounts to an unconstitutional prior restraint, as it is "impermissibly broad and vague, and restricts [Gassman] from speaking publicly." (Dkt. 1 ¶ 62.)

A.   **The Photo**

As an initial matter, the court concludes that Gassman's alleged displays of the photo constitute "speech" implicating the First Amendment. *T.V. ex rel. B.V.* v. *Smith-Green Cmty. Sch. Corp.*, 807 F. Supp. 2d 767, 777 (N.D. Ind. 2011) (displaying photographs "itself expressed an intention to communicate the expression inherent in the … conduct and the images of it … [and] qualifies as 'speech' within the meaning of the First Amendment").

---

[5] Gassman alleges that she has been prohibited from prominently displaying the photo "going forward." (Dkt. 1 ¶ 61.) Nevertheless, in her complaint and briefing, Gassman only argues a theory of prior restraint with respect to the Employee Manual. The court therefore does not evaluate Defendants' alleged action with respect to the photo as a prior restraint.

The proper analytical framework here is found in *Pickering-Connick* which is specific to government employees: the test "weighs a public employee's interest in freedom of speech against the government's interest in the efficient provision of services." *Brockett* v. *Effingham Cnty., Illinois*, 116 F.4th 680, 683 (7th Cir. 2024); *Pickering* v. *Bd. of Ed. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968); *Connick* v. *Myers*, 461 U.S. 138, 146 (1983).

To determine whether a plaintiff engaged in speech protected by the First Amendment, the court first asks if the employee spoke (1) as a private citizen; and (2) on a matter of public concern. *Brockett*, 116 F.4th at 683–84. If the answer to either of these questions is "no," then the employee has no First Amendment claim. *Id.* at 684. If both initial elements are met, the court next asks whether "'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern.'" *Id.* 116 F.4th at 684 (quoting *Pickering*, 391 U.S. at 568).

Gassman alleges that she displayed the photo on the mailboxes "to bring attention to the attacks that had occurred in Israel and the need to support the victims" and to "share the atrocities taking place." (Dkt. 1 ¶ 29.) She further alleges that the photo's "core message" is that "Israel and Jewish people have the right not to be exterminated." (*Id.* ¶ 39.)

Gassman's speech is unrelated to her employment and Defendants concede Gassman was speaking as a private citizen. The court therefore finds that Gassman spoke as a private citizen when she displayed the photo above the mailbox and in her private office. *Redd* v. *Dougherty*, 578 F. Supp. 2d 1042, 1052 (N.D. Ill. 2008) (concluding that plaintiff spoke as a private citizen where there was "no apparent connection between Plaintiff's actions and her official duties").

8

Next, the court considers whether Gassman spoke on a matter of public concern. Speech is directed at a matter of public concern if it "relates to any matter of 'political, social, or other concern to the community.'" *Redd*, 578 F. Supp. 2d at 1052 (quoting *Wainscott* v. *Henry*, 315 F.3d 844, 849 (7th Cir. 2003)). A matter is not of public concern if it involves "a personal grievance of interest only to the employee." *Id.* The court finds that Gassman's speech relates to a matter of political and social concern. *See, e.g.*, *Salaita* v. *Kennedy*, 118 F. Supp. 3d 1068, 1083 (N.D. Ill. 2015) (concluding that tweets regarding conflict between Israel and Palestine that resulted in the deaths of Palestinian civilians were "certainly a matter of public concern" under *Pickering-Connick* test); *Newman* v. *Associated Press*, No. 1:24-CV-20684-KMM, 2024 WL 5063288, at *12 (S.D. Fla. Dec. 10, 2024) (noting that photographs of October 7 attack related to "issues of public concern" in evaluating claim under the Federal Anti-Terrorism Act).

The court next asks whether "'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees' outweighs 'the interests of the [employee], as a citizen, in commenting upon matters of public concern.'" *Brockett*, 116 F.4th at 684 (quoting *Pickering*, 391 U.S. at 568). Defendants argue that Gassman's interest in the speech "is outweighed by the operational interests of the Public Defender." (Dkt. 14 at 7.) Gassman refutes this and contends that engaging in the *Pickering* balancing test is premature.

The *Pickering* balancing test is a fact-intensive inquiry that "[n]ormally … will be possible only after the parties have had an opportunity to conduct some discovery." *Gustafson* v. *Jones*, 117 F.3d 1015, 1019 (7th Cir. 1997). Accordingly, "the Seventh Circuit has advised that such an issue should not be decided at the pleading stage." *Redd*, 578 F. Supp. 2d at 1052 (citing *Gustafson*, 117 F.3d at 1019) ("[W]e think it preferable to leave to defendant the burden of raising justification as an affirmative defense."). The court therefore concludes that conducting

9

the *Pickering* balancing test at this stage would be premature.[6] *Redd*, 578 F. Supp. 2d at 1052 (denying motion to dismiss First Amendment retaliation claim to allow discovery before applying the balancing test); *Salaita*, 118 F. Supp. 3d at 1083 (declining to engage "in a full-fledged *Pickering* balancing analysis at this early [dismissal] stage in the litigation"); *Moore* v. *Dart*, No. 22-CV-1406, 2024 WL 361240, at *9 (N.D. Ill. Jan. 31, 2024) ("At this early stage, based on the cold complaint alone, this Court cannot declare that the state's interests outweighed Moore's interests in speaking. … The parties need to gather the facts in discovery before this Court can weigh them on the scale."); *Caparelli-Ruff* v. *Bd. of Educ. of E. Aurora Sch. Dist. 131*, 695 F. Supp. 3d 983, 995 (N.D. Ill. 2023) ("[T]he Court defers further consideration of the *Pickering* balancing test until a later phase of this litigation, after the parties have developed the factual record.").

Defendants contend that courts "have applied the *Pickering* balancing test at the motion to dismiss stage, albeit in limited circumstances." (Dkt. 8 at 11.) Defendants cite *Salaita* v. *Kennedy*, 118 F. Supp. 3d at 1083, for this proposition, which again does not assist them. In *Salaita*, the court *declined* to apply the *Pickering* balancing analysis "at this early stage in the litigation." *Id.* While the court conceded that "there are some cases where a plaintiff has 'pled herself out of court,'" it emphasized that "those are 'rare cases' indeed." *Id.* (citing *Klug* v. *Chi. Sch. Reform Bd. of Trs.*, 197 F.3d 853, 859 (7th Cir. 1999)). Relevant here, the court clarified that those types of cases "usually involve speech that is not on a matter of public concern or

---

[6] Gassman alleges that the Public Defender's removal and censorship of the photo was "pretextual and based on its content." (Dkt. 11 at 6) (citing Dkt. 1 ¶¶ 42–50.) "Where a plaintiff claims that the stated grounds for his/her discipline were a pretext for the discipline imposed, the court does not apply the *Pickering* balancing test solely to the speech that defendants claim motivated the disciplinary action …. Rather, the court considers all of the speech that the plaintiff alleges is protected." *Reilly* v. *City of Atl. City*, 532 F.3d 216, 232 (3d Cir. 2008) (citation omitted). Because applying the *Pickering* balancing test is premature, however, the court need not reach these issues.

speech that is not protected at all." *Id.* This is no such case. The court therefore denies Defendants' motion to dismiss Count I to the extent it relies on allegations regarding the photo.

### B. Employee Manual

Defendants next move to dismiss Gassman's First Amendment prior restraint claim. Gassman argues that the Employee Manual operates as a prior restraint in violation of her First and Fourteenth Amendment rights. Prior restraints do not "apply to every restriction that affects speech." *Kole* v. *Vill. of Norridge*, 941 F. Supp. 2d 933, 952 (N.D. Ill. 2013). "The term 'prior restraint' is used to describe 'administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.'" *Samuelson* v. *LaPorte Cmty. Sch. Corp.*, 526 F.3d 1046, 1051 (7th Cir. 2008) (quotation omitted) (emphasis in original). To determine whether a policy qualifies as a prior restraint against a government employee, the court "first must determine whether that policy applies to speech that is protected by the First Amendment." *Id.* at 1052.[7] "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Id.* (quoting *Garcetti* v. *Ceballos*, 547 U.S. 410, 421 (2006)).

If the policy applies to protected speech, it may constitute a prior restraint when it meets four elements:

> "(1) the speaker must apply to the decision maker before engaging in the proposed communication[8]; (2) the decision maker is empowered to determine whether the applicant should be granted permission on the basis of its review of the content of the communication; (3) approval of the application requires the

---

[7] While the parties partly discuss Gassman's intended speech, the claim focuses on the allegedly restraining policy. *See, e.g.*, *Milwaukee Deputy Sheriff's Ass'n* v. *Clarke*, 574 F.3d 370, 382 (7th Cir. 2009) ("[W]e must first ask whether Directive 13-05 regulates solely unprotected speech ….").

[8] Failure to allege prior authorization does not necessarily defeat a First Amendment prior restraint claim. The government may not "avoid the First Amendment simply by categorically banning speech and not providing a mechanism for redress." *Pelishek* v. *City of Sheboygan*, No. 23-CV-1048, 2024 WL 1051210, at *12 (E.D. Wis. Mar. 11, 2024).

> decision maker's affirmative action; and (4) approval is not a matter of routine, but involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker."

*Id.* at 1051 (quotation omitted).

"With a prior restraint, the government must demonstrate that 'the interests of both potential audiences and a vast group of present and future employees in a broad range of present and future expression are outweighed by that expressions' necessary impact on the actual operation of the Government.'" *Crue* v. *Aiken*, 370 F.3d 668, 678 (7th Cir. 2004) (quoting *United States* v. *National Treasury Employees Union*, 513 U.S. 454, 468 (1995); *Pickering*, 391 U.S. at 571)). Gassman identifies two policies in the Employee Manual that allegedly restrict her speech: (1) the Public Relations/Media Policy; and (2) the Social Media Policy.[9]

### a. Public Relations/Media Policy

Under the Public Relations/Media Policy, employees are restricted from speaking to the media "about the Law Office's policies, procedures or official positions on general matters." (Dkt. 1-3 at 72.) Employees are similarly prevented from initiating contact with the media "regarding policies, procedures, or the Office's positions on general matters, or regarding a particular case." (*Id.*)

At oral argument, counsel for Gassman contended that the terms "policies" and "procedures" contemplate broad categories of speech that could implicate Gassman's interest in speaking as a private citizen, including speech about her personal experience with enforcement of those policies. Defendants rejoin that the Employee Manual is "not

---

[9] In Count I ("First Amendment Violation"), Gassman alleges that the Employee Manual "is impermissibly broad and vague." (Dkt. 1 ¶ 62.) This language, albeit brief, appears to invoke the overbreadth and void-for-vagueness doctrines, both of which are distinct theories related to the First Amendment. Neither party's memoranda address these doctrines, however, so the court makes no determination as to whether they are sufficiently pleaded.

so broad as to ban her from speaking out about any matter of public concern … [and] only forbids her saying that her views represent the Public Defender's official position." (Dkt. 14 at 12.)

Gassman reads the Public Relations/Media Policy too broadly. Its "[p]urpose" is to "encourage[] free expression while protecting the interests of the Law Office's clients [and] recognize[] the need for uniformity and accuracy in representing our clients." (Dkt. 1-3 at 72.) In other words, the Public Relations/Media Policy prevents employees from speaking *on behalf* of the Public Defender. It does not preclude speech regarding the effect of the Public Defender's policies on Gassman personally. Indeed, Defendants conceded at oral argument that the Policy would not preclude her intended speech.

Accordingly, the Public Relations/Media Policy does not prohibit Gassman from speaking as a private citizen because it only applies to official matters. *Samuelson*, 526 F.3d at 1052 (concluding that chain-of-command policy restricting speech on matters "requiring administrative attention" only covered speech "grounded in the public employee's professional duties and therefore is not protected by the First Amendment"); *see also Clarke*, 574 F.3d at 383 (policy prohibiting speech regarding "official agency business" did not "apply to speech protected by the First Amendment"). The court therefore concludes that the Public Relations/Media Policy does not "qualify as a prior restraint." *Samuelson*, 526 F.3d at 1052.

### b. Social Media Policy

The Public Defender's Social Media Policy imposes "etiquette guidelines" on employees who "identify themselves as employees of the Cook County Public Defender's Office" on social media. (Dkt. 1-3 at 75). The Social Media Policy requires

13

covered employees to "be respectful" and, before sharing "a comment, post, picture or video," obtain consent "of any people or organizations identified by this activity." (Dkt. 1-3 at 75.) Gassman contends that this portion of the Social Media Policy "would prohibit [her] from sharing on Facebook the articles written about her court case and then criticizing (i.e., not being 'respectful') the oppressive manner that her specific supervisors confiscated her photograph." (Dkt. 11 at 11.)

The Social Media Policy is broad enough to restrict social media posts on any subject matter, including an employee's private affairs, so long as "any people or organizations [are] identified." (Dkt. 1-3 at 75.) It therefore applies to employees' speech as private citizens on matters of public concern.

Nevertheless, Gassman fails to plead facts supporting the essential elements of a prior restraint claim. Gassman does not allege that the Public Defender may grant or withhold consent to author a social media post based on the "content of the communication." *Samuelson*, 526 F.3d at 1051. The Social Media Policy is only premised on the directive to "[r]espect the privacy of others," and makes no reference to the content of the proposed speech. (Dkt. 1-3 at 75.)

Gassman also fails to allege that the Public Defender's approval "involves appraisal of facts, the exercise of judgment, and the formation of an opinion by the decision maker." *Samuelson*, 526 F.3d at 1051. Indeed, Gassman does not even specify the decision maker empowered to review posts; the Social Media Policy merely requires prior approval from "any people or organizations identified." (Dkt. 1-3 at 75.) Gassman suggests that the Policy provides Mitchell "unlimited discretion" to discipline her (dkt. 11 at 13), but this only refers to the Public Defender's general authority to take disciplinary

14

action after a policy violation takes place. (Dkt. 1-3 at 3) ("Failure to comply with any policy may subject the employee to discipline …"). Gassman alleges nothing about the Public Defender's process for reviewing social media posts before they occur. *See Harless by Harless* v. *Darr*, 937 F. Supp. 1351, 1353 (S.D. Ind. 1996) (explaining that "the relevant question is whether the challenged regulation *authorizes* suppression of speech *in advance of its expression*") (emphasis added in part) (citation omitted).

Without more, Gassman has failed to state a claim based on the Social Media Policy.[10] *See Kole*, 941 F. Supp. 2d at 953 (dismissing prior restraint claim where plaintiff failed to allege whether the defendant could "approve or reject a sign based on its content" or that approval "require[d] any exercise of judgment by the Village"). The court therefore grants Defendants' motion to dismiss Gassman's First Amendment prior restraint claim.

---

[10] Gassman's string citation does not compel a different conclusion. Unlike the allegations here, most cited cases evaluate policies where specific decisionmakers maintained discretion to restrain speech before it occurred or otherwise regulated the content of proposed speech. *Crue*, 370 F.3d at 676 (prohibiting contacts with prospective student-athletes without "the express authorization of the Director of Athletics or his designee, who have experience in these issues"); *Harman* v. *City of New York*, 140 F.3d 111, 121 (2d Cir. 1998) (preclearance policy lacked "objective standards to limit the discretion of the agency decision-maker"); *Lauretano* v. *Spada*, 339 F. Supp. 2d 391, 420 (D. Conn. 2004) (same); *Moonin* v. *Tice*, 868 F.3d 853, 867 (9th Cir. 2017) ("Like public employer pre-clearance policies held to be unconstitutional, the policy announced in Tice's email leaves entirely at the discretion of the trooper's 'manager/commander' the determination of which communications are 'appropriate.'"); *Wolf* v. *City of Aberdeen, S.D.*, 758 F. Supp. 551, 554 (D.S.D. 1991) (media ordinance constituted "an overt attempt to control the content of an employee's speech"); *Davis* v. *New Jersey Dep't of L. & Pub. Safety, Div. of State Police*, 742 A.2d 619, 629 (Law. Div. 1999) (regulation empowered employees to "decide which employees may speak publicly, when they may speak and the content of their speech"); *Brady* v. *Tamburini*, 518 F. Supp. 3d 570, 581 (D.R.I. 2021) (prohibiting speech without the "express approval of the Chief of Police or the [Public Information Officer]").

Other cited cases impose speech restraints far more burdensome than the Social Media Policy. *Liverman* v. *City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016) (regulation constituted "a virtual blanket prohibition on all speech critical of the government employer"); *Price* v. *Saugerties Cent. Sch. Dist.*, No. 105CV0465LEKDRH, 2006 WL 314458, at *5 (N.D.N.Y. Feb. 9, 2006) (policy made "no allowance for speech to any persons or entities other than the supervisor, superintendent or board of education").

## II. Indemnification (Count II)

In Count II, Gassman brings an indemnification claim against Cook County. Because a portion of Count I survives, "the indemnification count survives to the same extent." *Hicks* v. *City of Chicago*, No. 15 C 06852, 2017 WL 4339828, at *12 (N.D. Ill. Sept. 29, 2017).

## CONCLUSION AND ORDER

For the foregoing reasons, Defendants' motion to dismiss (dkt. 8) is granted in part and denied in part. The court grants without prejudice the motion to dismiss Gassman's First Amendment prior restraint claim and denies the motion as to the remainder of Count I. The court dismisses Count II to the same extent. Gassman may file an amended complaint by April 4, 2025.

Date: March 21, 2025

                                                  U.S. District Judge Joan H. Lefkow